**Ed FOSTER and El Paso Times, Inc., Appellants,**

**v.**

**Richard UPCHURCH, Appellee.**

**No. 7051.**

Court of Civil Appeals of Texas, El Paso.

Feb. 11, 1981.

Rehearing Denied March 11, 1981.

Scott, Hulse, Marshall, Feuille, Finger & Thurmond, Richard Munzinger, Carolyn Crinkley, El Paso, for appellants.

Law Offices of Bill McCoy, P. C., Bill McCoy, Odessa, for appellee.

## OPINION

OSBORN, Justice.

This is a venue case involving Subdivision 29 of Article 1995, Tex.Rev.Civ.Stat.Ann. (Vernon 1964). The trial Court overruled the Appellants' pleas of privilege to be sued in El Paso County. We affirm.

While a prisoner in the Hudspeth County jail, Veloz Zuniga received injuries which resulted in his death. A suit was filed by his widow and children against the Hudspeth County Sheriff, Claymon McCutcheon, and the County. That suit was subsequently settled. On February 28, 1980, a Times columnist, Ed Foster, wrote and the El Paso Times published an article about the event. The first paragraph of the article said:

> The death nearly three years ago of Juan Veloz Zuniga after the Culberson County sheriff beat him over the head with a sawed-off pool cue set off a furor across much of Texas.

Later in the story, Mr. Foster reported that the defendants in this suit were "Sheriff Claymon McCutcheon and Hudspeth County Commissioners Court, * * *." The next to the last paragraph of the story said:

> Witnesses to the incident said McCutcheon responded to a call from a trusty and opened the cell-block door. When Veloz Zuniga rushed out, McCutcheon hit him in the head at least three times with the sawed-off pool cue.

He also noted in the story that the Hudspeth County grand jury had refused to indict the Sheriff.

At the time of this incident, Richard Upchurch was the Sheriff of Culberson County, Claymon McCutcheon was Sheriff of Hudspeth County and the incident, as correctly reported at the end of Mr. Foster's column, occurred in Hudspeth County. Sheriff Upchurch was in no way involved in the incident which resulted in the prisoner's death and the subsequent lawsuit. About a week after the first story, Mr. Foster noted the error and at the end of one of his columns gave an apology for his mistake.

At the venue hearing, Sheriff Upchurch was the only witness. The newspaper column with the original story and the subsequent article with the apology were received in evidence. Sheriff Upchurch testified that the first paragraph of the initial story was false. There is no real dispute about that issue in this case.

In order to sustain venue under Subdivision 29, a party has to establish (1) that a cause of action for libel accrued in his favor against the defendants; (2) the date of its accrual; and (3) that the plaintiff resided in the county where suit was filed on that date. *General Motors Acceptance Corporation v. Howard*, 487 S.W.2d 708 (Tex.1972). The only issue in this case is with regard to whether the evidence establishes a cause of action. The Appellants contend the article is not libelous because there has been no showing of "actual malice" in this case which involves a public official.

The most recent case to consider what proof is required in order to sustain venue under Subdivision 29 is *Times Herald Printing Co. v. Bessent*, 601 S.W.2d 487 (Tex.Civ. App.—Beaumont 1980, writ dism'd). In that case, an officer in the Department of Public Safety was reported to have been fired from the Department "for allegedly planting narcotics on suspects and roughing up persons arrested on narcotics charges." At the venue hearing, he testified he was not fired for the reasons set forth in the newspaper article. The Court, in the opinion by Justice Keith, concluded that in cases involving a media defendant and a public figure as a plaintiff, it is necessary for the

plaintiff to show that the statement was made with "actual malice" in order to establish a cause of action. The Court concluded that in such cases malice is not an affirmative defense, which would be immaterial on the issue of venue, but is an essential element of the plaintiff's prima facie case. The Court relied upon the holdings in *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), 95 A.L.R.2d 1412; *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403 (Tex.1969); and *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (Tex.1976). Under the holding in *Trexler*, the same rule applies to Sheriff Upchurch, who is a public official. *Also see: Time, Incorporated v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

In his brief, Appellee suggests that the *Bessent* case "appears to be directly on point." It is then contended that malice was established in the trial Court hearing. This Court considered most of the recent cases involving malice in our opinion in *Ryder Truck Rentals, Inc. v. Latham*, 593 S.W.2d 334 (Tex.Civ.App.—El Paso 1979, writ ref'd n. r. e.). In that opinion, we noted that, with regard to the defamation of a public official or public figure, the applicable rule, as set forth in *Restatement (2d) of the Law, Torts 2d* sec. 580A (1977), is:

One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other person, or

(b) acts in reckless disregard of these matters.

The explanatory comment under the above section of *Restatement* states:

d. *Knowledge or reckless disregard as to falsity and defamatory character.* The constitutional protection of a defamatory communication regarding a public official or public figures does not apply if the publisher of the communication knows

that the statement is false. It also does not apply if he publishes the communication in reckless disregard of its truth or falsity.

Reckless disregard is held not to be measured by whether a reasonable, prudent person would have published the statement without more investigation. Reckless disregard is said to exist, however, when there is 'a high degree of awareness of probable falseness' of the statement, or there are 'serious doubts as to [its] truth.' Availability of sufficient time and opportunity to investigate the truth of the statement is a significant factor in determining whether the publisher was negligent (see subsection 580B, Comment *h* ), and it may have some relevance in determining whether the publisher acted with reckless disregard as to truth or falsity.

There being no findings of fact or conclusions of law, we must presume the trial Court made the necessary findings to support the order overruling the pleas of privilege. The basic issue then becomes one as to whether there is some evidence to support the implied finding of "actual malice," meaning that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Dun and Bradstreet, Inc. v. O'Neill*, 456 S.W.2d 896 (Tex.1970).

In *Montandon v. Triangle Publications, Inc.*, 45 Cal.App.3d 938, 120 Cal.Rptr. 186 (1975), cert. denied 423 U.S. 893, 96 S.Ct. 193, 46 L.Ed.2d 126 (1975), 84 A.L.R.3d 1234, a party who the Court identified as a public figure recovered a substantial jury verdict based upon a report about her in TV Guide. Miss Montandon, who wrote a book entitled "How to be a Party Girl," planned television appearances to publicize the book. After several changes in the notice about her appearance, the copy as ultimately printed by TV Guide read:

'10:30 [2] Pat Michaels—*Discussion* [para.] [Color] "From Party Girl to Call Girl." Scheduled guest: TV Personality Pat Montandon and author of "How to Be a Party Girl." '

In affirming the trial court's judgment, the appellate Court said:

Reviewing the evidence as we are required to do (*New York Times Co. v. Sullivan, supra*, 376 U.S. 254, 285, 84 S.Ct. 710 [728, 11 L.Ed.2d 686]; *Belli v. Curtis Pub. Co., supra*, 25 Cal.App.3d 384, 389, 102 Cal.Rptr. 122), we find that the principles required in a libel action by a public figure were constitutionally applied, and that the verdict is substantially supported.

The persons responsible for the publication of the article testified that in the alteration of the article as originally submitted, they followed the usual practice of the magazine and had no intention of indicating to the public that Miss Montandon might be a call girl. However, it is not the elimination of any portion of the original article in itself which gave plaintiff the cause of action, but it was the article which resulted. Leaving the article without something more than the brief statement which remained, resulted in the false impression of Miss Montandon's status. While this result was apparently not intentional, it was one which those responsible should have foreseen and one which showed a reckless disregard for the truth or falsity of the statement. The conduct of those responsible for the publication was more than negligence, it amounted to an indifference to the impression being given to the general public.

■ We conclude there is some evidence to support the trial Court's implied finding. In the same article which made the false statement about "the Culberson County sheriff beat[ing] him [Mr. Zuniga] over the head with a sawed-off pool cue," Mr. Foster reported the defendants in the resulting litigation were "Sheriff Claymon McCutcheon and Hudspeth County Commissioners Court, * * *." He also reported that "McCutcheon hit him in the head at least three times with the sawed-off pool cue." In addition, his article said: "Three weeks later, a Hudspeth County grand jury ruled out any action against the sheriff." Clear-

ly, Mr. Foster knew which Sheriff was involved because he reported "McCutcheon did not return phone calls to his office Wednesday inviting him to comment." Certainly, the trial Court could reasonably assume that those calls were placed to him in Hudspeth County where he lived and worked as a public official.

We believe any reporter who reports that "black is white" and in the same article says "black is black" must necessarily know that one of the statements is false, or have a high degree of awareness of probable falseness, or at least have serious doubts as to its truth. That is basically what happened in this article. Mr. Foster knew who the defendants were in the case and so reported in his article. He knew who the witnesses said hit the prisoner. He knew which county grand jury investigated the incident. He even attempted to have the sheriff involved comment on the settlement about which he was reporting. And yet, knowing all of this, he began his story by attributing what he concluded was a newsworthy incident to the Appellee who was in no way involved.

We conclude that the trial Court could have determined either that the defamation was made by one knowing that it was false, because later in the column he gave the true facts, or at least that he acted in reckless disregard of the true facts which were subsequently reported in the same column. Defamation—Public Figures—Malice, 20 A.L.R.3d 988 at sec. 5 (1968). The constitutional privilege of reporting about public officials does not give the press the right to make defamatory statements which are contrary to known facts correctly reported in the same story. In this case, Mr. Foster was not trying to meet a deadline of a recent event. *See: Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024 at 1026 (5th Cir., 1975). Instead, he was writing about the end of a lawsuit which arose out of an event nearly three years before. And yet, despite having all of the facts, he attributed a rather dastardly act to an innocent public official. We agree with the holding in *Tucker v. Kilgore,* 388 S.W.2d 112 (Ky. 1964), that "[t]he freedom of 'uninhibited, robust, and wide-open' debate on public is-

sues guaranteed by the 1st Amendment cannot sensibly be turned into an open season to shoot down the good name of any man who happens to be a public servant."

The Appellants' two points of error are overruled, and the order of the trial Court is affirmed.

WARD, Justice, dissenting.

I respectfully dissent. The only disagreement that I have with the opinion is that the Court uses the original article to sustain the Plaintiff's burden of showing actual malice. The adroit argument is based on the premise that the inference is clear that the writer admits he has the correct information and with that accuses the wrong Sheriff—thus the conclusion is reached that he either had to then know his statement was false or he acted with reckless disregard of whether it was false or not.

I disagree for the following reasons. First, it is just as reasonable to conclude or infer from a reading of the article that there has been careless writing or printing of the article, which at best is negligence. It is common knowledge that such mistakes occur regularly in our newspapers. The conclusions of either malice or negligence are equally consistent. " 'Where circumstances are equally consistent with the existence and nonexistence of an ultimate fact sought to be established, such circumstances are wanting in probative force as any evidence tending to establish the existence of the ultimate fact.' " *Calvert v. Union Producing Company,* 402 S.W.2d 221 (Tex.Civ. App.—Austin 1966, writ ref'd n. r. e.). "Where the proven circumstances are consistent with either of two theories and there is nothing to show that one rather than the other probably is correct, than neither is proven." *Transport Insurance Company v. Campbell,* 582 S.W.2d 173, 177 (Tex.Civ. App.—Houston [1st Dist.] 1979, writ ref'd n. r. e.).

Second, the standard regarding malice generally requires more than the article itself since an "erroneous statement is inevitable in free debate, and ... it must be

protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.' " *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed. 125 (1964). This subject was considered in *Bandelin v. Pietsch,* 98 Idaho 337, 563 P.2d 395 (1977), where the plaintiff attempted to show from the articles involved that malice existed and where the Court held that malice was not established, saying:

> Malice is defined for first amendment purposes as knowledge of falsity or reckless disregard of truth. Its essence is a knowing state of mind on the part of the publisher. Although it is conceivable that the character and content of a publication could be so patently defamatory that a jury could infer a knowing state of mind on this basis alone, no case has so held. The argument was rejected on its facts in *New York Times Co. v. Sullivan, supra,* and *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 365 F.2d 965 (1966).

Usually more than the article itself is needed for the reason that otherwise a libelous article written, because of a mistake only, against a public official would be actionable. An example is shown by *Glover v. Herald Company,* 549 S.W.2d 858 (Mo.1977). There, the rewrite man received the correct information from a reporter concerning which of two alderwomen had admitted to having undergone previous abortions, but by mistake attributed the remark to the innocent plaintiff. The plaintiff argued that the rewrite man know the story was false because he had originally received the correct information from the reporter and therefore, in writing the incorrect story, he had to know it was false. The Court stressed that inadvertence, inaccuracy, or a failure to check for inaccuracies would support a finding of negligence, but that was constitutionally insufficient to show the degree of culpability or requisite state of mind to establish malice. *See generally:* Eldridge, The Law of Defamation, sec. 51 (1980).

For the reasons stated, I dissent. I would sustain the Appellants' no evidence point concerning the lack of proof of malice.