**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00091-CV**
_____

**SEAN DEVER, Appellant**

**V.**

**CHRISTOPHER VARGAS, MARIA MERCEDES VARGAS,**
**AND CHRISTA RENNA, Appellees**

_____

**On Appeal from the 410th District Court**
**Montgomery County, Texas**
**Trial Cause No. 18-07-09738-CV**
_____

**MEMORANDUM OPINION**

This is an appeal of a defamation claim and final judgment rendered by the

trial court in favor of the defendants.[1] Appellant Sean Dever (Plaintiff) appeals the

trial court's Order of Mutual Nonsuit, which was the final judgment that disposed of

the remaining claims in the suit as to Appellees Maria Mercedes Vargas (Vargas)

---

[1] Dever also asserted an intentional infliction of mental anguish claim but on appeal he does not challenge the summary judgment that the trial court granted on that claim.

1

and her son, Christopher Vargas (Christopher), and therefore made previously interlocutory summary judgment orders entered in favor of Appellee Christa Renna appealable. We affirm.

Background

Sean Dever (Dever) made a complaint and raised an issue with The Woodlands Township Development & Standards Committee (the Township Committee) about a home-based "massage parlor" being operated by Vargas from her own residence in The Woodlands. Dever, who owns rental property in the same neighborhood, claimed that the operation of the business from the Vargas residence violated the standards and restrictions set by the Township Committee and was inappropriate for any neighborhood in The Woodlands. According to Christa Renna (Renna), Dever had attempted to shut the business down since 2010 and started a "Petition to Close Down the Vargas Central American Massage Parlor[,]" and the petition claimed that the "Central American Massage Parlor" has "increased traffic volume, parking violations, aggressive behavior, and Montgomery County Sheriffs responding to the problems associate[d] with the massage parlor." Dever allegedly walked door to door in the neighborhood trying to obtain signatures for the petition, and in 2017, allegedly rang the doorbell to the Vargas house and Vargas called the police. The Montgomery County Sheriff's Department arrived and issued a trespass

2

warning to Dever. In August of 2017, Christopher informed the Township Committee that Dever had used racial slurs against him and his mother.

In January 2018, Dever went to Renna's home which is also located in the same neighborhood as Vargas. While there, Dever attempted to disburse a flyer in an effort to shut down the "massage parlor." According to Renna, her husband had an encounter with Dever while Dever was on Renna's property. Renna's husband declined to accept the flyer and Dever refused to leave the property, "shouting how he was going to 'shut them down' and 'they are bad people.'" As a result of the encounter, Renna sent an email in January of 2018 to her neighbors stating the following:

> Our neighbor, [] Vargas . . . needs our help.
> A man named Sean Dever[] has a personal vendetta against [Vargas]. He has been threatening and harassing her, has used racial slurs and even damaged her property. She has had to get a restraining order against him through the Montgomery County Sheriff[']s Department. This harassment has been going on for more than 7 years. Sean Dever[] does not even live on [the same street as Vargas lives]. He only has a home on [the same street as Vargas lives] that he rents out.
> [Vargas] has lived in her home for 20+ years and raised her 4 (now grown) children here. She is a US citizen. She is a licensed massage therapist and her home business has been permitted through The Woodlands Township since 2010. She does no more than 7 massages a week in her home. There is no public advertising. There are no signs on her property. Her clients are her personal friends.
> Sean Dever[] is trying to deny her the right to make a living by asking that The Woodlands Township revoke her business permit. He has gone to the Development Standards Committee requesting the permit be revoked and the Committee found that [Vargas's] business is compliant. This happened in August of 2017.

3

Since then, Sean Dever[] has gone door to door in our neighborhood telling a salacious story about a "massage parlor' being run out of a home which has brought seedy characters and unwanted traffic to the neighborhood. He has asked us to sign a petition which many did because the story he tells is scary and signing the petition seemed like the right thing to do.

But imagine if this was you. Imagine if this was your mother. Just minding your own business, trying to make a living, you don't bother anybody. And a man is trying to turn your neighbors against you and smearing your name to the public. How would you feel? How would your children feel?

The result of this petition is under review by the Woodlands Development Standards Committee on Wednesday January 17, 2018[.]

So here is what I'm asking: If you signed the petition and now feel like you shouldn't have, or if you feel compassion for a neighbor that is being wronged, please contact the name below and express how you feel. Or attend the meeting and show your support for [Vargas] in person. I am doing both!

Dever sued Vargas, Christopher, and Renna for defamation and intentional infliction of mental anguish. Dever's petition alleged that at meetings before the Township Committee, Christopher and Vargas made statements that Dever's basis for objecting to Vargas's business was primarily motivated by racism. Dever also alleged that Renna authored and published emails to residents of the neighborhood stating that (1) a restraining order had been issued against Dever in favor of Vargas and her family; (2) Dever previously damaged Vargas's property; and (3) Dever told the neighborhood residents that Vargas's clients were seedy or there was seedy activity occurring in and around the Vargas home. Dever alleged that Vargas's, Christopher's, and Renna's statements were false, defamatory, intended to embarrass him and cause harm to his reputation and credibility, caused harm to his

4

reputation, and that the statements were made in bad faith and with malice because they knew the statements were made recklessly and with the knowledge that they were false.

After Renna filed her answer generally denying Dever's allegations and asserting affirmative defenses, she filed a Traditional Motion for Summary Judgment on the defamation claim and a No-Evidence and Traditional Motion for Summary Judgment on the intentional infliction of mental anguish claim. Dever filed responses to both motions, and Renna filed replies to his responses. In separate orders, the trial court granted Renna's motions for summary judgment.

After Vargas and Christopher filed their answer generally denying Dever's allegations and asserting affirmative defenses, they filed a Traditional Motion for Summary Judgment. Dever filed a response to the Vargas summary judgment motion. Vargas and Christopher filed a counterclaim for intentional infliction of emotional distress against Dever. Vargas, Christopher, and Dever filed an Agreed Motion for Mutual Nonsuit with Prejudice, and the trial court signed an Order of Nonsuit granting the motion and dismissing the claims between them with prejudice.

Dever filed a Motion for New Trial as to the trial court's grant of Renna's motions for summary judgment on Dever's claims against Renna. The trial court denied Dever's motion for new trial, and Dever appealed.

## Appellate Issues

On appeal, Dever only challenges the trial court's grant of Renna's traditional motion for summary judgment on his defamation claim. In his first issue, Dever argues that the trial court erred in granting summary judgment in favor of Renna on Dever's claim for defamation because material fact issues existed with respect to whether the statements Renna made concerning Dever defamed him. In issue two, Dever argues that the trial court erred in granting summary judgment in favor of Renna on Dever's defamation claim because a fact issue existed concerning Dever's status as a limited-purpose public figure.

## Standard of Review

We review grants of summary judgment de novo. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). The movant for a traditional motion for summary judgment has the burden to establish that no genuine issues of material fact exist and that movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). If the moving party produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence that raises a material fact issue. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). The trial court may consider all competent evidence on file at the time of the summary judgment hearing. *See* Tex. R. Civ. P. 166a; *Lance v. Robinson*, 543 S.W.3d 723, 732 (Tex. 2018).

In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon*, 690 S.W.2d at 548-49. Every reasonable inference must be indulged in favor of the nonmovant, and any doubts must be resolved in the nonmovant's favor. *Id.* at 549. Because the trial court's orders in this case granting the partial summary judgments do not specify the grounds for its summary judgments, we must affirm the summary judgments if any of the theories presented to the trial court and preserved for appellate review are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003) (citing *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)).

Analysis

We address Dever's second issue first, wherein he argues that the summary judgment evidence does not support the trial court's conclusion that Dever was a limited-purpose public figure required to prove actual malice. To prove the elements of a defamation claim, a plaintiff must demonstrate "(1) the publication of a false statement of fact to a third party[;] (2) that was defamatory concerning the plaintiff[;] (3) with the requisite degree of fault, at least amounting to negligence[;] and (4) damages, in some cases." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (citing *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015)). A statement is defamatory if it "'tends [] to harm the reputation of

7

another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Id.* (quoting Restatement (Second) of Torts § 559 (1977)).

"The status of the person allegedly defamed determines the requisite degree of fault." *Lipsky*, 460 S.W.3d at 593. To prevail on a defamation claim, public officials and public figures must prove that the defendant published a defamatory falsehood with "actual malice." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). To establish actual malice, the plaintiff must prove that the defendant published a defamatory statement with "'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* at 573-74 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). To establish "reckless disregard" in this context, a defamation plaintiff must prove that the publisher "'entertained serious doubts as to the truth of his publication.'" *Id.* at 574 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). For purposes of defamation liability, public figures fall into two categories: (1) all-purpose, or general-purpose, public figures and (2) limited-purpose public figures. *Id.* at 571.

Limited-purpose public figures are public figures only for a limited range of issues surrounding a particular public controversy. *Id.* To determine whether an individual is a limited-purpose public figure, we apply a three-part test: (1) the controversy at issue must be public both in the sense that people are discussing it

8

and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.* (citing *Trotter v. Jack Anderson Enterps., Inc.*, 818 F.2d 431, 433-34 (5th Cir. 1987); *Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980)). Whether a person is a limited-purpose public figure is a question of law for the court to decide. *Klentzman v. Brady*, 312 S.W.3d 886, 904 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966)).

In Renna's Motion for Summary Judgment on Dever's defamation claim, she not only alleged that her statements were not defamatory, but she also argued that Dever is a limited-purpose public figure under the test adopted in *Trotter/Waldbaum*. On appeal, Dever asserts that fact issues exist concerning his private/public status and, therefore, the fault level required for recovery. According to Dever, the facts in this case do not support the trial court's implicit finding that Devers is a limited-purpose public figure as a matter of law. Dever argues that the first two factors of the *Trotter/Waldbaum* test are not met under the facts of this case.[2]

---

[2] Dever's appellate brief does not make an argument as to the third factor, so we interpret that as a concession that the alleged defamation was germane to his participation in the controversy.

According to Renna's Motion for Summary Judgment on Dever's defamation claim, the first factor under *Trotter/Waldbaum* is satisfied because this is a public controversy because the entire neighborhood discussed the issue, Dever's petition to shut Vargas's business down was signed by at least twenty people and seen by others, Dever raised the issue in a public forum at the Township Committee meetings on at least two occasions, Dever made a presentation of the issue before another committee that represents different townships in the Woodlands area, local newspapers reported on the issue, and the statements in her email were her opinions surrounding an issue that was before a public forum, namely the Township Committee.

As to the first factor, Dever argues that (1) "Renna did not show there was something more regarding Dever or the Vargas Defendants than a general interest[;]" (2) "[t]here was no actual press coverage of the ongoing 'debate,' and no reporting of what people, other than []Renna[,] said[;]" (3) "Renna created the controversy by making an issue of Dever's efforts[;]" and (4) "[h]e did not seek publicity and merely tried to accomplish an objective through the Committee's established process."

As summary judgment evidence relating to the first *Trotter/Waldbaum* factor, Renna attached to her motion highlighted excerpts of Dever's deposition wherein he testified that he first approached the Township and objected to Vargas's business in

10

2010, that he met Renna's husband when he was knocking on doors to obtain signatures from those in Vargas's neighborhood for the petition to present to the Township Committee his challenge Vargas's home-based "massage parlour[,]", that he spoke in opposition to Vargas's business at the Residential Design and Review Committee meeting on December 14, 2017, and the Township Committee meetings in August 2017 and on January 17, 2018, and that Renna's statements with which he has issue were comments surrounding an issue that was before a Township forum and that a public hearing resulted from his petition efforts and Renna's email efforts. Renna attached her affidavit wherein she averred, among other things, that Dever had walked around the neighborhood trying to gather support to shut down the business and have the neighbors sign a petition, that Dever spoke at public hearings urging The Woodlands Township to close the business, and that Dever and his wife have spoken to the press about their wish to have the business closed down. Renna also attached Dever's "Petition to Close Down the Vargas Central American Massage Parlor" signed by twenty individuals and excerpts from Dever's deposition wherein he testified that he took the petition door to door to get support for the petition. Renna also attached a Sign-in Sheet for the Township Committee meeting August 2, 2017, showing twenty-seven attendees in addition to the Committee members and a Sign-in Sheet for the Township Committee meeting January 17, 2018, showing thirty-seven attendees in addition to the Township Committee

11

members when Dever allegedly challenged the operation of Vargas's business in a public forum. Renna attached the notes from a December 14, 2017 meeting of the Indian Springs Residential Design and Review Committee (a different committee) when Dever presented the issue of Vargas's operation of her business in her home. Renna attached articles dated September 8, 2017, and Friday, January 19, 2018, from a local newspaper, The Courier, discussing Dever's challenge to Vargas's home-based business. Based on this evidence, we conclude that Renna presented evidence that the controversy at issue is public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution. Therefore, the burden shifted to Dever to present evidence raising a material fact issue as to the first factor, which he failed to do.

Renna argued in her summary judgment motion that the second factor under *Trotter/Waldbaum* was satisfied because Dever had more than a trivial role in the controversy and "has been the spearhead behind trying to shut down the Vargas business for the past nine years." According to Renna, Dever himself contacted the Township Committee to request that it not permit the business to continue, and when the Township Committee refused, he requested a public hearing. Renna also argued that Dever himself walked around the neighborhood several times informing neighbors of his position against the business and trying to obtain support for his cause. On appeal, Dever argues that he did not seek publicity about his efforts against

12

the massage business and that Renna produced no evidence he had access to the media or that he voluntarily engaged in activities that necessarily involved the risk of increased exposure or injury to his reputation.

As summary judgment evidence of the second factor, Renna attached to her motion excerpts from Dever's deposition where he testified that he first approached the Township and objected to Vargas's business in 2010, he went door to door seeking signatures for his petition challenging Vargas's business, and he spoke at multiple public forums advocating against the business. Renna attached her sworn affidavit wherein she averred, among other things, that Dever had walked around the neighborhood trying to gather support to shut down the business and have the neighbors sign a petition, that Dever spoke at public hearings urging The Woodlands Township to close the business, and that Dever and his wife have spoken to the press about their wish to close the business. Renna also attached Dever's "Petition to Close Down the Vargas Central American Massage Parlor" signed by twenty individuals and excerpts from Dever's deposition wherein he testified that he took the petition door to door to get support for the petition. Because this evidence is sufficient to show that Dever has more than a trivial or tangential role in the controversy, the burden shifted to Dever to produce evidence that a material fact issue exists as to this factor. Dever, however, failed to do so.

13

As to the third factor under *Trotter/Waldbaum*, Renna argued in her motion for summary judgment that the factor is satisfied because the alleged defamatory statements made in her email directly relate to Dever's actions in trying to close Vargas's business. As for summary judgment evidence as to the third factor, Renna referred to excerpts of Dever's deposition attached to her motion wherein Dever admitted that Renna's statements with which he had issue were comments surrounding an issue that was before a Township forum and that a public hearing resulted from his petition efforts and Renna's email efforts. We conclude that Renna established the alleged defamation was germane to Dever's participation in the controversy as a matter of law. Dever, in response, produced no controverting evidence establishing a genuine issue of material fact regarding this factor.

Having established that Dever is a limited-purpose public figure as a matter of law, we next turn to whether Renna provided summary judgment evidence that she did not act with malice. In a public-figure defamation case, a libel defendant is entitled to a summary judgment under Rule 166a(c) by negating actual malice as a matter of law. *See Casso v. Brand*, 776 S.W.2d 551, 555 (Tex. 1989). Once the defendant has produced evidence negating actual malice as a matter of law, the burden shifts to the plaintiff to present controverting proof raising a genuine issue of material fact. *Huckabee v. Time Warner Entm't Co., L.P.*, 19 S.W.3d 413, 420 (Tex. 2000). Although at trial the plaintiff must establish actual malice by clear and

14

convincing evidence, at the summary judgment stage the court applies the traditional summary judgment jurisprudence in testing whether the evidence raises a genuine issue of material fact. *Id.* at 420-23.

Affidavits from interested witnesses will negate actual malice as a matter of law only if they are "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex. R. Civ. P. 166a(c); *Casso*, 776 S.W.2d at 558 ("could have been readily controverted[]" does not simply mean movant's proof could have been easily and conveniently rebutted). In actual-malice cases, such affidavits must establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief. *Huckabee*, 19 S.W.3d at 424. Although actual malice focuses on the defendant's state of mind, a plaintiff can prove it through objective evidence about the publication's circumstances. *Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000).

Renna stated in her affidavit, "I believe the statements in my January 13, 2018 email are true and accurate based on my personal knowledge of the matter, as outlined below[,]" and she explained the bases for her belief:

> [] Personal Vendetta: My opinion that Mr. Dever has a personal vendetta against Ms. Vargas is based on the fact that he has been trying to shut down her massage business since 2010. He has walked around the neighborhood trying to gather support to shut down her business and have the neighbors sign a petition. He has spoken at public hearings urging that The Woodlands Township close down her business.

15

Further, Mr. Dever and his wife have spoken to the press about their wish that the Vargas business be closed down. Mr. Dever actually came to my home in January 2018 seeking support for closing down the business. When asked to leave the property, he refused, got belligerent, and shouted how he was going to "shut them down" and "they are bad people" and "they don't belong here."

[] Threatening and Harassing: My opinion that Mr. Dever has been threatening and harassing towards Ms. Vargas is based on the fact that for the past several years he has gone to her house complaining about her business and her client's vehicles. Ms. Vargas has told me that she felt threatened and harassed in these interactions. His conduct has prompted Ms. Vargas to call the police to have him removed from her property, and the Montgomery County Sheriff's Department issued a criminal trespass warning to Mr. Dever as a result of his behavior. Further, I saw his aggression towards the Vargas business when he came to my house in January 2018 as he screamed that he was going to "shut them down".

[] Damaged Property: My statement that Mr. Dever has damaged Ms. Vargas' property is based on my conversation with Mercedes and Christopher Vargas where they informed me of an incident when Mr. Dever came to their house complaining about a client's vehicle and he banged on the garage door and damaged it. Ms. Vargas later spoke at a public hearing of the Woodlands Township about this same incident.

[] Racial Slurs: My statement that Mr. Dever has used racial slurs was based on my discussions with Mercedes and Christopher Vargas regarding their prior interactions with Mr. Dever. Further, Mr. Dever refers to Ms. Vargas' home massage business as a "Central American Massage Parlor."

[] Restraining Order: My statement that Ms. Vargas "has had to get a restraining order against him through the Montgomery County Sheriff's Department" was merely referring to Ms. Vargas having to call the police on Mr. Dever and the Montgomery County Sheriff's Department issuing him a criminal trespass warning.

[] Salacious Story/Seedy Characters: It is my opinion that Mr. Dever has been spreading a "salacious" story about Ms. Vargas' business. Mr.

16

Dever has continuously referred to the home-based business as a "massage parlor" which certainly implies a story that can be described as "salacious." It is also my opinion that Mr. Dever claims that the Vargas business is bringing in "seedy characters" based on the fact that I read a 2017 article concerning Mr. and Ms. Devers' complaints about the business and Mr. Dever's wife is quoted as stating, "[The Vargases] have all types of customers and employees coming into their home and into (our) neighborhood" and "These are strangers." A copy of the article is attached hereto as Exhibit 1. I have never seen any unusual activity coming from the home of Mercedes Vargas or anything to indicate that Ms. Vargas was doing anything disrespectful to devalue the homes in the neighborhood, or causing "strangers" to come into my neighborhood.

Renna also attached excerpts from Dever's deposition where he testified that approximately six months prior to Renna's email he was issued a trespass warning by law enforcement to stay off Vargas's property, he met Renna's husband when he was knocking on doors to obtain signatures from those in Vargas's neighborhood for the petition to present to the Township Committee about his challenge to Vargas's home-based "massage parlour." Additionally, she attached Dever's deposition testimony wherein he stated he also had with him that day a document titled "Enough is Enough" that he testified stated "something to the effect that, 'We'd like to get our neighborhood back to normal[,]'" where he agreed that he could have possibly referred to Vargas and her son as "those people[,]" and where he agreed that calling something a "massage parlour" could have connotations of something being seedy although that was not his intention when he used the term. Renna also attached a document titled "Enough is Enough" that Dever testified he

17

carried with him going door-to-door that asked "[h]elp us close down the Central American Massage Parlor" at Vargas's address.

In Renna's affidavit she asserted that her statements in her email were true and accurate based on her personal knowledge and then she provided the basis for her statements. Renna's affidavit is "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *See* Tex. R. Civ. P. 166a(c); *Casso*, 776 S.W.2d at 558. We conclude Renna's affidavit establishes her belief in the truth of the statements she made in her email and includes, along with her other evidence, ample evidence of a plausible basis for her beliefs. *See Huckabee*, 19 S.W.3d at 424. Renna produced evidence that her statements were not made with knowledge that they were false, nor were they made with reckless disregard of whether they were false or not. *See WFAA-TV, Inc.*, 978 S.W.2d at 573-74. Accordingly, Renna's affidavit negates actual malice as a matter of law and Renna shifted the burden to Dever to produce controverting evidence that raised a genuine issue of material fact concerning actual malice. *See Huckabee*, 19 S.W.3d at 420.

In his response to Renna's motion and summary judgment proof as to the third factor, Dever argued that Renna's statements are not opinions or verifiable facts, he denied the allegations in Renna's email, he argued that Renna has no personal knowledge or evidence to support her statements and her statements were not based

18

on the truth and do not constitute substantial truth, and he argued that Renna did not condition her statements in the email as "opinions" but instead intended her statements to be read by others as sinister remarks intended to inflict harm upon him and his reputation. For controverting evidence, he attached his affidavit in which he stated, in relevant part:

> Renna's published remarks are wholly false and defamatory. I had never pursued any type of vendetta against the Vargas family. I had never threatened or harassed the Vargas family. I most certainly have not used racial slurs against the Vargas family. I have never damaged the Vargas home or their property. No restraining order has ever been issued against me in favor of the Vargas family. I have not told residents [on Vargas's street] that Ms. Vargas' massage clients were seedy or there was seedy activity occurring in and around the Vargas home. I did not smear the Vargas' name to the public.
>
> I attended the deposition given by Renna on August 15, 2019, at her attorney's office. At this deposition, Renna stated she had no personal knowledge or evidence of any of the claims she had made against me in the email she had published. She admitted she did not know me or had even been aware of the issues I had raised with The Woodlands Township [] Committee. Her email accusations against me were not conditioned or couched as being her "opinion" only but seemed to state she had personally witnessed such conduct on my part and implicated me as being a "racist."
>
> The email statements from Renna were false, baseless and intended to cause severe harm to my reputation. She made no investigation of the claims she asserted against me, but her sole source of any information about me came from Maria Vargas and Christopher Vargas, who are also defendants in this lawsuit. Her email remarks, which were broadcast to members of The Woodlands Township [] Committee, residents of The Woodlands who attended the particular meetings, and residents of [the street where Vargas lives], were intended to portray me as a "racist" and damage my reputation and credibility in the

community where I live, as well as ridicule and embarrass me in a public forum.

Renna's statements about [me] were entirely false and made in bad faith and with malice. Her libelous publications were made with such utter recklessness as to indicate a disregard for the consequences of her false remarks and conscious indifference to my rights.

On appeal, Dever asserts that the trial court had no evidence upon which it could have found Renna's statements were her opinions or were true or substantially true, Renna's affidavit is not competent summary judgment evidence because it is "little more than a set of conclusions[,]" and conclusions are not competent summary judgment evidence.

Dever's affidavit alleged that Renna made her statements "in bad faith[,] with malice.…[and] with such utter recklessness as to indicate a disregard of the consequences of her false remarks and conscious indifference to [his] rights." However, in his affidavit he appears to base these conclusions on Renna's lack of knowledge and his denial of the truth of Renna's alleged defamatory statements. Texas courts have held that falsity alone is not probative of actual malice. *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 255 (Tex. App.—San Antonio 1996, no writ) (actual malice cannot be inferred from falsity of the challenged statement alone); *see also Fort Worth-Star Telegram v. Street*, 61 S.W.3d 704, 713 (Tex. App.—Fort Worth 2001, pet. denied) (defendant's testimony established plausible basis for professed belief in truth of publication, thus negating actual

20

malice even if publication was not substantially correct). As for Dever's assertion in his affidavit that Renna "made no investigation of the claims she asserted against [him]," we note that the failure to investigate has been held to be insufficient to establish actual malice. *See Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 756 (Tex. 1984) (reckless conduct is not measured by whether a reasonably prudent person would have investigated before publishing; and a plaintiff must show defendant entertained serious doubts as to the truth of the publication at the time of the publication) (citing *St. Amant*, 390 U.S. at 731, 733); *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403, 405-06 (Tex. 1969) (proof of utter failure to investigate amounted to no evidence of actual malice). Dever's affidavit fails to raise a genuine issue of material fact regarding whether Renna's statements were made with knowledge that they were false or with a reckless disregard of whether they were false or not. *See WFAA-TV, Inc.*, 978 S.W.2d at 573-74. We conclude that Dever has failed to raise a fact issue on actual malice and, therefore, Dever failed to controvert Renna's negation of actual malice.

Because Dever's second issue is dispositive, we need not address issue one. *See* Tex. R. App. P. 47.1. We also note that on appeal Dever does not challenge the trial court's order granting Renna's motion for summary judgment on Dever's intentional infliction of mental anguish claim and does not challenge the trial court's order granting the motion for nonsuit between Christopher, Vargas, and Dever.

21

Therefore, we need not address those claims as they are waived. *See Jacobs v. Satterwhite*, 65 S.W.3d 653, 655-56 (Tex. 2001) (concluding that failing to raise an issue on appeal waives error); *see also* Tex. R. App. P. 38.1(f), (i) (requiring an appellant's brief to concisely state all issues presented for review and to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). We affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on September 9, 2021
Opinion Delivered February 17, 2022

Before Golemon, C.J., Horton and Johnson, JJ.

22